IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEX MARTOS, | ) | |
|     Plaintiff | ) | |
|     vs. | ) | Civil Action No. 06-1544 |
| | ) | Judge Terrence F. McVerry/ |
| WASHINGTON COUNTY; | ) | Magistrate Judge Amy Reynolds Hay |
| WASHINGTON COUNTY | ) | |
| CORRECTIONAL FACILITY; WARDEN | ) | |
| JOSEPH PELZER, individually and in his | ) | |
| capacity as Warden of the Washington | ) | |
| County Correctional Facility; CAPTAIN | ) | |
| KING, individually and in his capacity as | ) | |
| Corrections Officer with the Washington | ) | |
| County Correctional Facility; OFFICER | ) | |
| DZIAK, individually and in his capacity as | ) | |
| a Corrections Officer with the Washington | ) | |
| County Correctional Facility; | ) | |
| WASHINGTON COUNTY OFFICE OF | ) | |
| THE DISTRICT ATTORNEY; and | ) | |
| JOHN C. PETTIT, individually and in his | ) | |
| capacity as the District Attorney of | ) | |
| Washington County, | ) | |
|     Defendants | ) | |

REPORT AND RECOMMENDATION

I.    Recommendation

Pending in this prisoner civil rights action are two Motions for Summary Judgment. The first, (Doc. 40), was filed by Defendants John C. Pettit ("Pettit") and the Office of the Washington County District Attorney ("District Attorney's Office"). The second, (Doc. 46), was filed by the remaining Defendants, Washington County ("the County"), the Washington County Correctional Facility ("the Facility"), and Facility employees Warden Joseph Pelzer ("Pelzer" or "the Warden"), Captain Michael King ("King"), and Officer Charles Dziak, ("Dziak"). The

Court recommends that both Motions be granted, and that the Court decline to exercise jurisdiction over the remaining state law claim.

II.  Report

  A. Background

On February 1, 2002, the Plaintiff, Alex Martos ("the Plaintiff" or "Martos"), appeared in the Court of Common Pleas of Washington County, Pennsylvania, where he pled guilty to the first degree murder of Ira Swearingen. As part of an underlying plea agreement, the state agreed to withdraw its notice to seek the death penalty. Martos, in turn, agreed that his sentencing would be delayed, and that he would co-operate in the prosecution of alleged participants in crimes associated with the murder. Between the date of his plea and the date of his sentencing, Martos was incarcerated, among other places, at the Facility, where events giving rise to this lawsuit took place.

On June 26, 2006, Martos filed an action pursuant to 42 U.S.C. § 1983 in the Court of Common Pleas of Washington County, Pennsylvania. That action was subsequently removed to this Court. In Count I of the five count Complaint (Doc. 1), Martos contends that his rights under the Fifth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution were violated by actions taken or policies adopted by the Defendants in order to ensure that Martos continued to serve as an informant. Martos alleges that when he refused to continue in that role, he was caused to suffer "the loss of privileges, false disciplinary charges and punishments, physical beatings, and threats to revoke his plea bargain. . . . " (Doc. 1 at ¶ 11). Martos asserts in Count II that he was subject to assault and battery by King and Dziak in retaliation for his failure to cooperate with Pettit. In Count III he alleges intentional infliction of emotional distress by all

Defendants. Martos claims in Count IV that the events underlying Counts I - III established a Section 1983 action under the holding in DeShaney v. Winnebago County Dep't. of Soc. Serv., 489 U.S. 189 (1989), in that Martos was injured by those with whom he had a special relationship, or as the result of a state created danger. In Count V, Martos maintains that he was subjected to retaliation for exercising his First Amendment right to complain to a local newspaper about the Facility's substandard food.

In response to the Complaint, Defendants filed Motions for Summary Judgment, contending first that most of the incidents comprising the Complaint were barred by the governing two year statute of limitations which expired on June 26, 2006:

> [Specifically, this bar pertains to Plaintiff's claims regarding being utilized as an informant by the office of the District Attorney and any and all derivative aspects of being an alleged informant, including [Martos's claim that he received] privileges, promises of sexual favors, jail immunities for various offenses, false disciplinary charges and punishments, threats to revoke his plea bargain . . , the alleged retaliation following the publication of a newspaper article complaining about the substandard food, the alleged creation of false extradition papers, the alleged comments regarding Plaintiff's representation by counsel, and the alleged comments regarding [Martos's] ability to defend himself in the event he was forced to injure or kill [a] fellow inmate . . . .

(Doc. 42 at 2-3) (internal citations to the record omitted).

The Defendants contend next that summary judgment should be granted as to Pelzer and Pettit based on their lack of personal involvement in the wrongs alleged. Last, the Defendants argue that Martos failed to demonstrate impropriety in his conviction or sentence, failed to state a claim for intentional infliction of emotional distress, and did not establish that his conditions of confinement rose to the level of an Eighth or Fourteenth Amendment violation. (Id. at 9-16.)

In his Brief Opposing the Motions for Summary Judgment (Doc. 54), Martos abandoned the majority of his claims,[1] conceding that the "focal point" of the case is the beating alleged to have been inflicted by King and Dziak (Id. at 2). According to Martos, this beating was ordered by Pettit to punish Martos for his refusal to collect information in an ongoing murder investigation.

B. Standard of Review

A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party must respond by presenting evidence that a genuine issue of material fact compels a trial. Id. at 324. In doing so, the non-moving party must point to specific facts rather than to "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). This means that the non-moving party cannot defeat summary judgment by relying on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir.1999). The mere existence of some evidence favoring the non-moving party will not defeat the motion. There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In evaluating the evidence, the Court

---

[1] Martos has withdrawn Counts III, IV, and V of his Complaint. (Doc. 54 at p.7 n.1). To the extent that Count I asserts violations of the Fifth and Ninth Amendments, Martos abandons it. He also concedes that summary judgment should be granted in favor of the individual defendants with respect to the section 1983 claims brought against them in their official capacities. See A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 581 (3d. Cir. 2002). He does not contest that the Facility and the District Attorney's Office, as arms of Washington County, are also entitled to summary judgment.

4

must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). The Court may not assess credibility or the weight of the evidence; it may determine only the existence of a triable issue of fact. Big Apple BMW of N. Am. Inc., 974 F.2d 1358, 1362 (3d Cir. 1992). A motion for summary judgment will be granted where the materials in the record, if reduced to admissible evidence, would be insufficient to satisfy the non-moving party's burden of proof at trial. Celotex, 477 U.S. at 322.

    C. Legal Analysis

        1. The Outstanding Federal Claims

The only claims remaining pertain to the injury allegedly inflicted upon the Plaintiff by King and Dziak at Pettit's direction:

> [These two Defendants] had gone cell to cell looking for a prisoner who hollered while another prisoner was being struck by guards. When they reached Martos' cell . . . King repeatedly maced and kicked him while Dziak tackled and punched him. Following the beating Plaintiff was left for two and half days without access to a shower resulting in his face neck, eyes, head and chest becoming red and welted up. Further, per King's order, he was denied toilet paper forcing the use of his own hand.

(Doc. 1 at ¶ 16).[2]

In addition to claiming that these acts constituted assault and battery under state law, Martos contends that he was deprived of due process rights guaranteed by the Fourteenth

---

[2] In his declaration, Martos states that he was in his cell brushing his teeth when King and Dziak entered. (Martos's handwritten statement at 28). Presumably, he was doing this at a sink, and thus would have had at least some ability to wash himself, particularly his face, neck, and chest, where the worst of the symptoms were concentrated.

5

Amendment to the U. S. Constitution. When the incident occurred, Martos had entered a guilty plea to homicide, but had not yet been sentenced. His constitutional status was, therefore, that of a pretrial detainee. See Fuentes v. Wagner, 206 F.3d 335, 3421 (3d Cir. 2000). A pretrial detainee may not be subjected to punishment prior to "an adjudication of guilt in accordance with due process of law." Bell v. Wolfish, 441 U.S. 520, 535 (1979). Whether particular actions constitute punishment within the meaning of the Fourteenth Amendment turns on whether they "are rationally related to a legitimate nonpunitive government purpose and whether they appear excessive in relation to that purpose." ( Id. at 561). "Retribution and deterrence are not legitimate nonpunitive governmental objectives." (Id. at 539 n.20).

Martos alleges that he was subjected to excessive force, meaning that he was punished. He also alleges that the punishment inflicted was cruel and unusual under the Eighth Amendment. ( Doc 1 ¶ 24). Pretrial detainees do not have rights under the Eighth Amendment; their protection against cruel and unusual punishment is grounded in the Fourteenth Amendment, which guarantees the detainee "at a minimum, no less protection than a sentenced inmate is entitled to under the Eighth Amendment." Fuentes, 206 F. 3d at 344 (quoting Colburn v. Upper Darby Twp., 838 F.2d 663, 668 (3d Cir. 1988) abrogated on other grounds by Leatherman v. Tarrant County Narc. Intel. & Coordination Unit, 507 U.S. 163 (1993).

The Defendants respond to Martos's Fourteenth Amendment claims by contending that the assault did not occur. They point to the fact that the only record evidence supporting Martos's claims is his unsubstantiated testimony. Alternatively, the Defendants argue that the injury described by Martos was clearly de minimis, and that, in any event, he failed to demonstrate that any Defendant - other than King and Dziak - was linked to the alleged attack.

The Court need not reach the parties' substantive contentions, because it finds Martos failed to exhaust available administrative remedies with respect to his Fourteenth Amendment claims.[3]

### a. The Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), reads, in part: "no action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id.

This exhaustion requirement applies to all inmate suits regarding prison life, including general circumstances as well as particular episodes. Porter v. Nussle, 534 U.S. 516 (2002). See also Concepcion v. Morton, 306 F.3d 1347 (3d Cir.2002) (recounting history of exhaustion requirement). There is no "futility" exception to the administrative exhaustion requirement. Ahmed v. Dragovich, 297 F.3d 201, 206 (3d Cir.2002) (citing Nyhuis v. Reno, 204 F.3d 65, 75 (3d Cir. 2000)). Where a plaintiff has failed to exhaust available administrative remedies, federal courts are barred from hearing a claim.

---

[3] Failure to exhaust administrative remedies is an affirmative defense which a defendant must plead and prove. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002). Although the Defendants raised this defense in their Answers, (Doc. 3 and Doc.7), they do not address exhaustion in the context of summary judgment. Where the Court is satisfied that a plaintiff has failed to exhaust available administrative remedies, it may grant summary judgment on this ground sua sponte, so long as the plaintiff is given notice and an opportunity to be heard. Canell v. Bradshaw, Nos. 95-35351, 94-36208,1996 WL 547978, at *5 (9th Cir. September 26, 1996) See also Celotex, 477 U.S. at 326 ("District Courts [have] power to enter summary judgment sua sponte, if the losing party had notice that she had to come forward with all of her evidence."). This Report and Recommendation constitutes the required notice, and the right to file Objections gives Martos the opportunity to be heard. See Magouirk v. Phillips, 144 F.3d 348, 359 (5th Cir. 1998); Canady v. Baker, No. 96-4354, 1998 WL 123996, at *1 (6th Cir. March 13, 1998).

7

In <u>Spruill v. Gillis</u>, 372 F.3d 218 (3d Cir. 2004) the Court of Appeals for the Third Circuit held that the PLRA mandates "proper" exhaustion, meaning that the plaintiff must adhere to the procedural requirements of the grievance process established by the institution in which he is incarcerated. (<u>Id.</u> at 228, 231). This includes meeting established deadlines. <u>Woodford v. Ngo</u>, 548 U.S. 81, 88 (2006). In order to avoid procedural default, an inmate must comply with the institutional process, appealing a grievance through all available administrative levels of appeal.

b. <u>The Facility's Grievance Process</u>

The grievance procedures applicable here are described by Pelzer in his deposition testimony. According to the Warden, the grievance process is set out in a Policy and Procedures Manual, a document maintained in CD form at the Facility. (Pelzer Depo. at 31). The process is initiated with the inmate's filing a formal grievance form. (<u>Id.</u> at 24). A form may be obtained from the Shift Commander, who downloads and prints the form at a computer. (<u>Id.</u> at 42, 45). The Shift Commander attempts to resolve the grievance at that point. (<u>Id.</u>) If this is not possible, the inmate writes the substance of his grievance on the form, which is returned to the Shift Commander or given to a Captain. It is then taken to the Warden or one of two Deputy Wardens. (<u>Id.</u> at 46- 47). Less often, the Shift Commander or Captain places the form in the Facility's internal mail. (<u>Id.</u>). The inmate may also place the form directly into the internal mail box on his housing unit. (<u>Id.</u>). Mail is collected every night on all the housing units, and brought to the visitors' receptionist where it is sorted and delivered. Grievance forms are directed to one of the three Wardens. (<u>Id.</u>). A Deputy Warden then answers the grievance on the same form, and

8

returns it to the inmate. (Id. at 42). If the inmate is not satisfied with the decision, he files an appeal to the Warden.( Id.). The decision of the Warden is final.( Id.). [4]

### c. Were Administrative Remedies Available to Martos?

The Court of Appeals has recognized that in certain circumstances prison officials may thwart an inmate's ability to utilize administrative remedies, so as to render those remedies "unavailable." Brown v. Croak, 312 F.3d 109, 113 (3d Cir. 2002). The issue of availability, when presented, is to be resolved by the District Court. See Mitchell v. Horn, 318 F. 3d 523, 529 (3d Cir 2003). Because Martos contends that corrections officers interfered with his ability to file a grievance, the Court turns to the record.

It is undisputed that Martos did not file a written grievance. (Pelzer Depo. at 141) (Martos's attorney recognizing that no grievance was filed). Martos claims that this was because he was unable to obtain a grievance form. Having evaluated this contention in light of the

---

[4]Pelzer's account of the administrative process - except for its lack of deadline references - substantially matches the description of the grievance process as described in the Facility's Policy Manual and set out in Irwin v. McGavitt, Civ. No. 04-246, 2007 WL 1113369 (W.D. Pa. April 12, 2007):

> [T]he applicable grievance procedures . . . require[] a formal grievance to be filed by the inmate within five days of the circumstances or incident at issue. The inmate is to deliver the grievance to the Housing Unit Officer or Shift Commander, who then signs off on the grievance and forwards it to the Deputy Warden of Security for disposition. If the inmate is not satisfied with the decision of the Deputy Warden of Security, he must file an appeal to the Warden within two working days of receiving the Deputy Warden's decision. The Warden is then required to review the appeal and provide a written response to the inmate within five working days. The decision of the Warden is deemed to be final.

(Id. at *4) (citations to Manual omitted).

9

record, the Court finds nothing, aside from Martos's bare allegations, to support the conclusion that the established grievance process was effectively "unavailable."

Martin's deposition testimony establishes that he was familiar with the formal grievance process, and that he successfully grieved the quality of Facility food in 2002:

> Q: So . . . you had been given instructions or there's an inmate Handbook concerning how grievances could be done, right?
>
> A: Yeah.
>
> Q: There were three - couple ways to doing a grievance. You could do an informal grievance, right, where you just do an oral complaint about something?
>
> A: You have to - first of all, what they have in the handbook is not the policy and procedure that they practice -
>
> Q: Okay.
>
> A. - for the grievances.
>
> Q. I see.
>
> A. If I wanted a grievance, or anybody in Washington County wanted a grievance, they need to go to the guard and the guard would call Captain Strawn. Now Captain Strawn would come up, hear your complaint, and decide whether he wanted to give you a grievance or not. The only reason I was given [the food-related] grievance right there is because I was cooperating with Mr. Pettit.

(Martos Dep. at 27-28).

Martos, who was in the Facility's disciplinary housing unit ("the SHU") at the time of and immediately following the alleged assault, does not allege that he requested a grievance form, asked to speak with Captain Strawn, wrote to Strawn, or sought to have him contacted at any time that he was in the SHU. He did not take any other action to initiate the grievance

10

process, although he states that he discussed the beating "a little bit in depth" with Officer Jeffrey Marraccini, a guard in the SHU, and, having access to a pen and paper, Martos wrote Marraccini a letter about the beating, and kept a log of his time in the SHU. (Martos Dep. 129-30, 135-6)

According to Martos, he sent this log to his attorney who received only three of the six pieces of correspondence. (Martos Depo. at 57).[5] Martos claims that he added the account of the beating to the margin of the log immediately prior to mailing it, because he was afraid that guards would find the papers and beat him again. (Id. at 70). Martos does not allege, however, that fear prevented him from discussing the alleged beating with Marraccini, ( id. at 129), or with an unidentified nurse in the presence of an unidentified guard. (Id. at 136).[6] Furthermore, although Martos had an attorney, and wrote to him regarding the alleged assault, he does not contend that he asked his attorney to pursue, or that his attorney took action to help Martos pursue a grievance based on the alleged beating.

Martos alleges that he did attempt to file a grievance after he left the SHU:

> A. So I get back on the block, I say something to one of the guards that's on the block. I believe it was Officer Shuban, okay? I tell him look, I'd like a grievance . . . I was beat while I was over there. Now, I don't know for sure if Shuban was the guard, but it was one of the guards working the housing unit when I came back over. He said that [he] would have to call Strawn. He called Strawn, never got a reply.

---

[5] Elsewhere in the record, Martos contends that none of the correspondence reached his attorney. (Martos's handwritten statement at 30).

[6] The record shows that a number of Facility personnel would have observed Martos on any given day. Yet, Martos has not pointed to anything in the record documenting that an incident report was filed, or that he requested, received, or was charged for medical care. Officer Marraccini testified at his deposition that he did not know from any source that Martos was assaulted, or that he was deprived of toilet paper. He also testified that he had never "observe[d] Martos when his face, neck, eyes, head and chest were red and welted . . ." (Marraccini Dep. at 9-10).

11

(Id. at 137).[7] According to Martos, Bryan Latkanich, a Facility counselor, advised Martos that he would call Strawn to request a grievance, but never got back to Martos. (Id. at 139). Martos states that he also requested that Captain Schmidt and "other guards who were working that day" give him a grievance form or call Strawn. (Id. at 139-140).[8]

When he was asked why he didn't just "fill out one of the forms," he answered:"We didn't have access to the forms. They were kept at the guard's desks [sic] and he had to issue

---

[7]The record does not contain testimony from Officers Shuban or Schmidt.

[8]Martos's handwritten declaration makes clear that the requests for a grievance and the information sought from Strawn after Martos was released from the SHU *were based not on an assault, but on alleged interference with Martos's mail* while he was in the SHU - an issue that is not part of this lawsuit. (See Martos Dep. at 57) (Martos's attorney received only three of six letters Martos sent); (Id. at 137) (Schmidt told Martos that Latkanich talked to Strawn about Martos's mail); (Id. at 140) ("I tried to have people call [Strawn], to have him come . . . see me. I tried to have them ask if I could have a grievance on *him*."); (Id. at 138) (Schmidt reported to Martos that he had seen Strawn, and was told that Strawn was the one who had control over Martos's mail); (Latkanich Dep. at 10, 39, 45) (Latkanich talked to Strawn about Martos's mail but does not remember Martos telling him that he had suffered an assault or other abuse). Martos does not allege in his statement that he attempted to file a grievance based on the alleged assault; his concern was with his mail. The following excerpt from his declaration is particularly telling:

> After my visit with [my attorney], I talked to the counselor, Brian Latkanich about my mail, who called Strawn and told him I wanted a grievance and copy's of my writeup's, Strawn told me that he would be or get back with me in a little bit, which he never did, so that after noon I talked to Captain Schimt and explained my problem to him about my mailing six letters to my attorney that he never received and me needing copies of the write up's that I was sent to the hole for. Captain Schimt told me that he would look into it for me, and get back to me in 24 hours.
>
> The next day on the afternoon shift captain Schimt got back to me and tole me that he did not understand what was going on that when I was put I the hole Captain Strawn was put in charge of my mail, that he would know what happened to my letters. I can still not get Captain Strawn to respond to me about my mail.

(Martos's handwritten statement at 29-30) (spelling and punctuation in original).

them to you." (Id. at 40). Martos alleges that he tried to have officers call Strawn, but doesn't remember which officers. He then changes his account, stating that he didn't ask Officer Marraccini for a form "because [guards] aren't allowed to hand them out to you. You have to go through their captains." (Id. at 141). Martos also alleges that he wrote to his attorney in order to secure help filing a grievance. This request does not appear in the record, nor is there any indication that his attorney instructed Martos as to how to proceed, took action to further the grievance process, contacted personnel at the Facility regarding Martos's difficulties, or documented Martos's inability to file a grievance. The Court also finds it significant that during Pelzer's deposition, Martos's attorney recognized - without commenting on any alleged inadequacy in the grievance process - that Martos had never filed a grievance with respect to the alleged beating. (Pelzer Depo. at 141).

### d. Findings

In evaluating the viability of Martos's assault-related claims, the Court is satisfied that there is no genuine issue of material fact with respect to whether Martos exhausted administrative remedies. In attempting to establish exhaustion, Martos, in his declaration and deposition testimony, does nothing more that reiterate the allegations set out in the complaint. There is no evidence beyond his own unsupported account that he attempted to grieve the assault, or that his ability to do so was blocked or impeded.

In order to survive a motion for summary judgment, a non-moving party is required to "designate *specific facts* showing that there is a genuine issue for trial." Celotex 477 U.S. at 324 (1986)(emphasis added). He "'cannot rely merely upon bare assertions, conclusory allegations or suspicions' to support [his] claim." Townes v. City of Philadelphia, Civ. No. 00-CV-138, 2001

13

WL 503400, at * 2 (E.D. Pa. May 11, 2001) (quoting Fireman's Ins. Co. v. DeFresne, 676 F.2d 965, 969 (3d Cir. 1982)).

The Defendants have placed in the record convincing evidence that Martos failed to file a grievance - formal or otherwise - as to the assault. Martos has not adduced evidence to the contrary. Not one of the Facility's deponents remembers communicating with Martos regarding a 2004 grievance other than one relating to interference with his mail while he was in the SHU. There is no documentary or testimonial evidence of an assault-related grievance.

"Congress's intent in passing the PLRA was to wrest control of prisons from lawyers and inmates and return it to prison administrators. The exhaustion provision of the PLRA is a bright-line rule." Brown v. Croak, 312 F.3d 109, 112 (3d Cir. 2002) (citing Ray, 285 F.3d at 294; Nyhuis, 204 F.3d at 75). Only "rare circumstances . . . will excuse this otherwise mandatory exhaustion requirement or . . . permit a finding that the administrative remedies were not really available as is required by § 1997(e)." Rodriguez Ramos v. Smith, No. 04-CV-0249, 2005 WL 3054291, at * 5 (3d Cir. Nov. 14, 2005). See, e.g., Candido v. Hogsten, No. 08-2273, 2009 WL 5648260 (3d Cir. March 5, 2009) (District Court erred in granting summary judgment based on exhaustion without considering that pro se prisoner had attached documents to his complaint showing that although he was denied forms, he wrote letters showing that he had attempted to file a grievance and an administrative appeal, but had never received answer from Warden or Regional Director); Brown, 312 F.3d at 109 (granting motion to dismiss or summary judgment premature where inmate had not been permitted to submit materials supporting claim that prison policy was misleading, security officials advised him that investigation had to be complete before grievance could be filed, and investigation was deliberately delayed).

This case does not present any analogous rare circumstance. In fact, motions to dismiss or for summary judgment have been granted on the basis of failure to exhaust where the prisoner has contested the failure on grounds far more compelling than those advanced here. For example, in <u>Rodriguez Ramos</u>, the non-English speaking illiterate inmate filed six requests for administrative remedies regarding the conditions of detention. After these requests were denied, he sought advice from his attorneys about the need to file appeals, and was advised that counsel for his criminal co-defendants would file his appeal as well. The prisoner eventually learned that his appeal had not been filed. He was, however, advised by his attorneys that the time for appeal had expired, and that appeal would be fruitless given that those filed by his co-defendants had been denied. Relying on this advice, the inmate took no additional action. When the Plaintiff filed a civil rights action, the District Court rejected the inmate's argument that his failure to exhaust should be excused. The Court wrote:

> Plaintiff does not claim or offer evidence that he sought assistance from the Warden or other prison officials in filing an appeal. This is, of course, the proper procedure under the regulations. Instead, Plaintiff relied on advice of his attorneys and did not seek to correct their errors once he learned of the problem. He did not try to appeal on his own and present his attorneys' error as the reason for the untimely nature of the appeal. In addition, he failed to seek assistance from the prison officials who are required to provide assistance to illiterate inmates.

2005 WL 3054291, at* 7. Citing the "mandatory nature of the exhaustion requirement," and the "rarity of finding circumstances that excuse exhaustion," the Court dismissed the complaint. 2005 WL 3054291, at * 7.

If the circumstances in <u>Rodriguez Ramos</u> were not extraordinary, those presented here could not even qualify as unusual. Martos has been represented by counsel at all relevant times.

15

Discovery in this matter has been completed. Even so, there is no evidence in the record to support Martos's contention that he exhausted, or was prevented from exhausting his administrative remedies. Accordingly, the Defendants' Motions for Summary Judgment should be granted .

      2. The State Law Assault Claim

Given that there is no viable federal claim, the Court should decline to exercise jurisdiction over Martos's state law assault and battery claim. See Bright v. Westmoreland County., 380 F.3d 729, 751 (3d Cir. 2004) (noting that although District Court has discretion under 28 U.S.C. § 1367(c)(3) to exercise supplemental jurisdiction where no federal claim remains, it should do so only in extraordinary circumstances). No such circumstance is presented here.

Iii.    Conclusion

For the reasons detailed above, it is recommended that the Defendants' Motions for Summary Judgment (Docs. 40 and 46) be granted, and that the Court decline to exercise jurisdiction over Martos's state law assault and battery claim.

                              Respectfully submitted,

                              */s/ Amy Reynolds Hay*
                              United States Magistrate Judge

Dated:   27 April, 2009


cc:    Hon. Terrence F. McVerry
       United States District Judge

       All counsel of record by Notice of Electronic Filing